**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

| | |
|---|---|
| JOHN FITZGERALD, | HONORABLE KAREN M. WILLIAMS |
| Plaintiff, | |
| v. | Civil Action |
| GLENN INSURANCE, INC., | No. 1:20-CV-14891 (KMW-EAP) |
| Defendant. | **OPINION** |

APPEARANCES:

Laura C. Mattiacci, Esquire
Console Mattiacci Law, LLC
1525 Locust Street
9th Floor
Philadelphia, PA 19102

Stephen G. Console, Esquire
Daniel S. Orlow, Esquire
Console Mattiacci Law, LLC
110 Marter Avenue, Suite 105
Moorestown, NJ 08057
        *Counsel for Plaintiff John Fitzgerald*

Laura A. Stutz, Esquire
Wilson Elser Moskowitz Edelman & Dicker LLP
200 Campus Drive
Florham Park, NJ 07932-0668
        *Counsel for Defendant Glenn Insurance, Inc.*

**WILLIAMS, District Judge:**

## I.    INTRODUCTION

This matter is before this Court on the Motion for Summary Judgment ("MSJ") filed by

Defendant Glenn Insurance, Inc. ("Defendant" or "GIC").  Defendant seeks summary judgment

on all counts of the Complaint, alleging violations of the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601, *et seq.*, the American with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101, *et seq.*, and the New Jersey Law Against Discrimination (the "NJLAD"), N.J.S.A. §§ 10:5-1, *et seq.*, filed by Plaintiff John Fitzgerald ("Plaintiff" or "Fitzgerald"). Plaintiff opposed this MSJ. Pursuant to Federal Rule of Civil Procedure 78(b), the Court has considered this MSJ without oral argument.[1] For the reasons set forth more fully below, GIC's MSJ is granted, in part, and denied, in part.

## II.    FACTUAL AND PROCEDURAL BACKGROUND[2]

The parties' Local Rule 56.1 statements reveal that this matter is rife with issues of fact.[3] The Court will recount the undisputed facts as derived from the statements. Moreover, the Court may also set forth additional and disputed facts only as necessary.

---

[1] This Court has jurisdiction pursuant to 28 U.S.C. § 1331 relating to the ADA and FMLA claims and 28 U.S.C. § 1367 relating to the NJLAD claim.

[2] For ease of reference, the Court will cite to court documents relating to these motions as follows:
- "Compl." refers to the Complaint (ECF No. 1).
- "MSJ" refers to Defendant's Motion for Summary Judgment (ECF No. 46).
- "Def.'s Br." refers to Defendant's Brief in Support of the Motion for Summary Judgment (ECF No. 46-2).
- "Def.'s SMF" refers to Defendant's Statement of Material Facts Not in Dispute (ECF No. 46-1).
- "Def.'s Ex. __" refers to Defendant's Exhibits A through DD (ECF Nos. 47-1 through 47-7).
- "Pl.'s Opp'n Br." refers to Plaintiff's Opposition to Defendant's MSJ (ECF No. 53).
- "Pl.'s RSMF" refers to Plaintiff's Response to Defendant's SMF (ECF No. 53-3).
- "Pl.'s Ex. __" refers to Plaintiff's Exhibits 1 through 44 (ECF No. 53-5; additional sealed Exhibits found at ECF No. 54).
- "Pl.'s SSMF" refers to Plaintiff's Counter Statement of Materials Facts (ECF No. 53-4).
- "Def.'s Reply Br." refers to Defendant's Reply Brief (ECF No. 55).
- "Def.'s RSSMF" refers to Defendant's Response to Plaintiff's SSMF (ECF No. 55-2).

[3] The Court must address some issues regarding the Local Rule 56.1 statements. Local Rule 56.1 is clear on what Courts in this District require from litigants in their statements. First, although Defendant filed a Reply Local Rule 56.1 statement (ECF No. 55-1) to Plaintiff's responding Local Rule 56.1 statement (ECF No. 53-3), the Court rejects this document because this District's Local Rule does not anticipate a reply. L. Civ. R. 56.1(a); L. Civ. R. 56.1(a), cmt. C ("the moving party is not permitted to reply to the non-moving party's responding statement); *see also Gupta v. Siemens Healthineers,* No. 19-3833, 2022 WL 807377, at *1, n.1 (D.N.J. Mar. 17, 2022). Second, the Local Rules require responding statements to either indicate agreement or disagreement (with citation) of a particular statement. There are several instances where neither agreement or disagreement is reflected but instead, the phrase "the document speaks for itself" is referenced. This is unhelpful to the Court and, as such, for purposes of this MSJ, the Court deems this particular response as an agreement to the cited fact.

### A.  GIC Hires Plaintiff

GIC is an insurance provider engaged in the provision of personal home, personal auto, life, health, and business insurance in New Jersey.  Def.'s SMF ¶ 1.  GIC operates two offices in New Jersey and does not operate any other offices within a 75-mile radius of these offices.  Def.'s SMF ¶¶ 2, 4.

In the summer of 2018, Plaintiff contacted Michael Thomas ("Thomas"), an Executive Vice President of GIC, to inquire about an employment opportunity at GIC.  Def.'s SMF ¶ 7.  Thomas, having worked with Plaintiff about thirty years earlier, encouraged Plaintiff to forward his resume.  Def.'s SMF ¶ 7.  In August of 2018, Plaintiff had a telephonic interview with Thomas L. Glenn, II ("Glenn"), President of GIC, and Jeffrey L. Dunn ("Dunn"), Executive Vice President of GIC.  Def.'s SMF ¶ 11.  Dunn also previously worked with Plaintiff thirty years earlier.  Def.'s SMF ¶ 11.  Plaintiff progressed to an in-person interview with Glenn, Thomas, and Dunn.  Def.'s SMF ¶ 16.  Sometime between the telephone and in-person interviews, Plaintiff received and annotated a job description provided by GIC to demonstrate how his skills aligned with GIC's needs for the position.  Def.'s SMF ¶ 15.  For instance, Plaintiff represented that he was skilled at using agency management systems and Excel.  Def.'s SMF ¶ 15.  Notably, GIC uses an insurance management software called Applied Epic ("EPIC") to handle daily operations.  Def.'s SMF ¶ 13.

GIC offered Plaintiff the position of Sales and Underwriting Manager on September 12, 2018, with an offer letter alerting Plaintiff that GIC is an at-will employer.  Def.'s SMF ¶¶ 17-18.  After accepting the offer and prior to his October 1, 2018 start date, Plaintiff requested GIC to send him to an EPIC conference from October 14 through October 18 "to jump start [his] orientation to EPIC, and [its] data mining capabilities [.]"  Def.'s SMF ¶¶ 19, 21.  Plaintiff also

stated that attendance at the conference would "help accelerate the build out [of] a robust and formalized sales process in a more timely manner." *Id.* GIC registered Plaintiff for the EPIC Conference. Def.'s SMF ¶ 20.

### B. Plaintiff's Performance Prior to His Medical Diagnosis

On October 1, 2018, Plaintiff began working as Sales and Underwriting Manager with GIC, reporting directly to Glenn as reflected on GIC's organizational chart, but, for the most part, Thomas handled Plaintiff's day-to-day activities. Def.'s SMF ¶ 22; Pl.'s RSMF ¶ 22. Plaintiff's responsibilities included, but were not limited to, learning EPIC; overseeing pipelines in EPIC for all producers and assisting them with filling up the pipeline; developing a sales process; getting to know GIC's markets; taking over the Sales Committee and Producer meetings; and establishing monthly underwriter meetings. Def.'s SMF ¶ 23.

Plaintiff's performance during his first few months and over the course of his tenure with GIC is heavily disputed by the parties. Defendant maintains that within weeks of hiring Plaintiff, there were already questions about Plaintiff's performance. Def.'s SMF ¶ 26. During Plaintiff's first three months, Defendant states it had to set up training to ensure Plaintiff understood the day-to-day activities of agency producers and underwriters, provide additional EPIC training for Plaintiff as his proficiency and understanding of the system was in question, and instructed Plaintiff to listen more during EPIC committee meetings. Def.'s SMF ¶¶ 26-28. Conversely, while Plaintiff does not dispute that he received EPIC training within his first weeks of employment, Glenn described Plaintiff's first two to three months of employment as "very impressive" and Plaintiff was appointed to the EPIC Committee by December 2018. Pl.'s RSMF ¶¶ 26-28. The EPIC Committee is comprised of one person from each of GIC's business

departments who are most proficient in the EPIC system and responsible for developing efficiencies within EPIC.  Def.'s SMF ¶ 29; Pl's RSMF ¶ 29.

Pre-February 2019 feedback on Plaintiff's transition into the role and training and ability to understand EPIC can be summarized as following:



- Def.'s Ex. L.

. Def.'s Ex. M.

- On December 4, 2018, Plaintiff had a one-on-one meeting with Glenn and his notes reflect the following: "EPIC Committee 'listen' instead of forcing [solutions]", which was presumably feedback delivered by Glenn to Plaintiff.[4]  Def.'s Ex. P.

---

[4] Defendant references Plaintiff's notation "need to plant flag re: my role in this" to support Glenn's testimony that Plaintiff asked Glenn to "plant the flag" relative to Plaintiff's role.  Def.'s SMF ¶ 7.  Plaintiff disputes this contention, and the Court simply cannot provide such an interpretation from the handwritten note.  Thus, this is yet another issue of fact.



Def.'s Ex. R.

### C. Plaintiff's Bladder Cancer Diagnosis

Plaintiff was diagnosed with bladder cancer in January 2019, which required an exploratory surgery to learn more about the nature of the cancer. Pl.'s SSMF ¶¶ 40-41. The exploratory surgery was performed on February 7, 2019, and resulted in the removal of multiple tumors. Pl.'s SSMF ¶ 42. On February 15, 2019, over President's Day weekend of 2019, Plaintiff texted Glenn requesting a reference for a urologist, which Glenn provided. Def.'s Ex. V. Glenn and Plaintiff also exchanged messages about whether Glenn was enjoying his ski weekend. Def.'s Ex. V. That same weekend, Plaintiff was informed that his bladder cancer was aggressive and high-grade. Pl.'s SSMF ¶ 43. On February 18, 2019, Plaintiff texted Glenn to see if he was available for a call to which Glenn responded, "yes." Def.'s Ex. V. What transpired during that call is material to this case and heavily disputed. Plaintiff testified that during the call, which included Plaintiff's girlfriend, he told Glenn about his bladder cancer diagnosis and the need for time off for procedures and treatment relating to same. Pl.'s RSMF ¶ 35. Glenn testified that Plaintiff told him that he needed to have an exploratory procedure to have cysts removed from his bladder. Def.'s SMF ¶ 35. Similarly in dispute is what happened when Glenn and Plaintiff met to discuss the February

---

[5] There are disputes surrounding the development of the sales process, such as, for example, when Plaintiff began working on it and whether plaintiff developed the process within an acceptable timeframe. Def.'s SMF ¶¶ 30, 32; Pl.'s RSMF ¶¶ 30, 32.

18, 2019 telephone call the following day. Defendant references testimony that Glenn told Plaintiff that there was no need to provide Glenn with details of his condition and that he should direct requests for time off to Henry Wimberg ("Wimberg"). Def.'s SMF ¶ 36. Plaintiff testified that Glenn, in an "explosive" manner, reprimanded him for providing details related to the cancer diagnosis. Pl.'s RSMF ¶ 36. Glenn admitted during his deposition that he was frustrated by the exchange with Plaintiff and told Plaintiff he could not be burdened with that type of information, he is not a medical concierge, and he should call Gilda's Club (a cancer support group). Pl.'s RSMF ¶ 36. There, however, remains a dispute about the tone used – Plaintiff testified that Glenn told him in a "sarcastic" and "insincere" manner. Pl.'s RSMF ¶ 36.

The record evidence leaves room for dispute as to additional individuals who knew of Plaintiff's cancer diagnosis. Particularly, there is a dispute about whether Dunn and Thomas explicitly knew Plaintiff had bladder cancer; both gentlemen knew that Plaintiff was experiencing a medical condition and he would require time off to address his condition. Pl.'s SSMF ¶ 50; Def.'s RSSMF ¶ 50. Thomas testified that Plaintiff told him about a cancer diagnosis; not bladder, prostate cancer. Pl.'s Ex. 3, 27:24-30:7. Dunn testified that he knew Plaintiff had a medical condition impacting his bladder and the need for time off for medical appointments was discussed by the EMT. Pl.'s Ex. 4, 22:8-24:24.

### D. Plaintiff's Cancer-Related Medical Appointments and Procedures

It is undisputed that Plaintiff's cancer-related treatments continued through 2019. Def.'s SMF ¶ 42; Pl.'s RSMF ¶ 42; Pl.'s SSMF ¶¶ 41-48; Def.'s RSSMF ¶¶ 41-48. Plaintiff's bladder cancer diagnosis did not affect his ability to perform his job duties at GIC. Def.'s SMF ¶ 38; Pl.'s RSMF ¶ 38. However, on various occasions, Plaintiff requested time off or to work from home due to both humiliation (i.e., the need to catharize himself in a shared bathroom at work) and to

attend medical appointments or undergo medical procedures, which at times included an associated recovery period. Def.'s SMF ¶¶ 38-40; Pl.'s RSMF ¶¶ 38-40. Plaintiff requested time off or to work from home throughout 2019 to attend to his medical condition. Pl.'s SSMF ¶ 63. After a request to work from home on July 15, 2019, Wimberg separately emailed Thomas (copying both Glenn and Dunn) the following:

> **Is [Plaintiff] still having medical issues? Why is he working from home all the time? What is he doing at home? We had decided in EMT to curb working at home and [Plaintiff] has been doing this often.**

Thomas replied:

> **He is having medical issues again. Not sure what he does from home; e-mails, meeting agenda and minutes I guess. EPIC training and pipeline review.**

Pl.'s Ex. 23. The parties dispute whether Wimberg was expressing frustration about Plaintiff's ongoing need to work from home due to medical issues. Pl.'s SSMF 64; Def.'s RSMF ¶ 64. On August 15, 2019, Wimberg sent an email to all Defendant's employees stating:

> There was a discussion at a recent management meeting about employees working from home so we are sending this email to review our company policy.
>
> Glenn Insurance requires all employees to work from one of our office locations or in certain sales situations that may require client location visits. If you are not able to be in the office due to illness, family matters or other reasons, you will be required to use PTO or an authorized leave of absence for that time out of the office. Exceptions to this policy may be made for certain unusual or unique circumstances but only with Executive Management Team approval in advance of the dates for which you will be out of the office.

Pl.'s Ex. 43.

On September 23, 2019, Plaintiff informed Wimberg that he would be having surgery on October 3 or 4 and would not know whether he would need to request "a work from home accommodation" following the surgery. Pl.'s Ex. 43; Pl.'s SSMF ¶ 65. On October 3, 2019, Plaintiff submitted a request to work from home directly to Glenn. Pl.'s SSMF ¶ 66. Plaintiff left

a voicemail for Glenn, and then followed up with an email attaching a note from his surgeon to explain the need to work from home. Pl.'s SSMF ¶ 66. The note provided by Plaintiff's surgeon cleared him to return to work on October 7, 2019. Pl.'s SSMF ¶ 66. On November 4, 2019, following another procedure, Plaintiff submitted another note from his surgeon. Pl.'s SSMF ¶ 67. The surgeon's note indicated that Plaintiff received medical treatment on November 4, was clear to work from home on November 5, and would return to work on November 6, 2019. Pl.'s SSMF ¶ 67. While there is evidence that Wimberg accused Plaintiff of not complying with Defendant's policy for taking time off and cut Plaintiff off when Plaintiff tried to explain the seriousness of his illness, the stated timing of the exchange is not clear from the cited testimony. Pl.'s SSMF ¶¶ 68-70.

Prior to his termination, Plaintiff requested time off to attend medical appointments on December 12, 2019, and January 6, 2020. Pl.'s SSMF ¶ 71.

### E. Post-Diagnosis Occurrences and Termination

The parties dispute many post-diagnosis developments concerning Plaintiff's relationship with Glenn and Plaintiff's performance. First, there are disputes about whether Plaintiff was "ostracized" and excluded from attending lunches with Glenn. Plaintiff testified that he and Glenn would have lunch from time to time, but Glenn testified that they only had lunch once. Pl.'s SSMF ¶ 62; Def.'s RSSMF ¶ 62. Plaintiff also testified that Glenn stopped attending the producer new business meetings hosted by Plaintiff while also acknowledging that Glenn did not attend regularly, and the meetings started to occur less frequently. Pl.'s SSMF ¶ 62; Def.'s RSSMF ¶ 62.

Regarding Plaintiff's performance, it is heavily disputed. Plaintiff maintains that he was never advised of performance issues and his proficiency with EPIC was not raised until after his cancer diagnosis; Defendant maintains that Plaintiff's performance was not adequate, partly

because he could not grasp EPIC.  Indeed, Plaintiff continued to be trained on EPIC in 2019.  On March 6, 2019, Plaintiff contacted Janet Stiles ("Stiles") requesting to meet with her to validate his knowledge of EPIC to date, meaning to test and reinforce what he knew and identify knowledge gaps so he could concentrate on "shoring" up those areas.  Def.'s Ex. X.  Stiles replied with a date and instructed Plaintiff to bring a list of the areas Plaintiff will have to concentrate on for his job duties.  Def.'s Ex. X.  ████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████  Def.'s Ex. W.

Plaintiff met with Mr. Glenn in April 2019 to discuss Plaintiff's progress on EPIC.  Def.'s SMF ¶ 44.  In May 2019, Plaintiff assumed responsibility over the underwriting staff which Glenn envisioned as the formation since Plaintiff's hire and same was anticipated to occur after Plaintiff became more proficient with EPIC and "earned the respect" of employees.  Pl.'s Ex. 1, 105:1-106:24.  ██████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████  Def.'s Ex. Y.  Notes from the meeting reflect the following:

██████████████████████████████████████████████████

Def.'s SMF ¶ 46; Def.'s Ex. Y.

It is undisputed that around July 2019, Plaintiff was removed from the EPIC committee, though, here again, the reasons for removal are disputed.  Def.'s SMF ¶ 49; Pl.'s RSMF ¶ 49.  Also in July, during a July 25, 2019 EMT meeting, Glenn inquired about how Plaintiff was progressing in his position and Thomas indicated that ████████████████████████████████



”[6]  Def.'s Ex. Z.

In October 2019, Plaintiff prepared his own performance review, with overall favorable ratings, and presented it to Mr. Glenn.  Def.'s SMF ¶ 50.  Glenn and Plaintiff's discussion of the performance review is heavily disputed and Glenn never provided written feedback.   On November 12, 2019, the EMT met and, as to Plaintiff, the meeting minutes reflected:



Def.'s Ex. CC.  Days before his termination, Plaintiff also prepared a list of contributions in an email dated November 19, 2019 to Thomas and Dunn which provided:

---

[6] Defendant states that it continued to question the sufficiency of Plaintiff's performance during the summer of 2019 citing only to Exhibit Z and Plaintiff's removal from the EPIC Committee.  Def.'s SMF ¶¶ 48-49.

Def.'s Ex. BB.  Plaintiff did not mention his medical condition in either the performance review or the November 19, 2019 email.

On November 21, 2019, Glenn and Wimberg met with Plaintiff and told him that he would be let go and his position would be eliminated.  Def.'s SMF ¶ 54.  Plaintiff's alleged poor performance was not cited during this meeting as the reason for termination.  Pl.'s SSMF ¶ 74; Def.'s RSSMF ¶ 74.

### F.  Plaintiff's Complaint

On October 23, 2020, Plaintiff filed this Complaint against GIC alleging violations of the FMLA, NJLAD, and ADA.  More specifically, Plaintiff claims that GIC unlawfully retaliated against him and interfered with his rights under the FMLA, and that he was discriminatorily discharged on the basis of disability, denied reasonable accommodations, subjected to a hostile work environment, and retaliated against under the ADA and NJLAD.

## III.   LEGAL STANDARD

A court may grant summary judgment when the materials of record "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Lang v. New York Life Ins. Co.*, 721 F.2d 118, 119 (3d Cir. 1983). "A fact is 'material' under Rule 56 if its existence or nonexistence might impact the outcome of the suit under the applicable substantive law." *Santini v. Fuentes,* 795 F.3d 410, 416 (3d Cir. 2015) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)); *see also M.S. by & through Hall v. Susquehanna Twp. Sch. Dist.*, 969 F.3d 120, 125 (3d Cir. 2020) ("A fact is material if—taken as true—it would affect the outcome of the case under governing law."). Moreover, "[a] dispute over a material fact is 'genuine' if 'a reasonable jury could return a verdict for the nonmoving party.'" *Santini*, 795 F.3d at 416 (quoting *Anderson*, 477 U.S. at 248).

The moving party bears the burden of identifying portions of the record that establish the absence of a genuine issue of material fact. *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). The burden then "shifts to the nonmoving party to go beyond the pleadings and 'come forward with 'specific facts showing that there is a *genuine issue for trial*.''" *Id.* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). To survive a motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party. *Anderson*, 477 U.S. at 256–57. "A nonmoving party may not 'rest upon mere allegations, general denials or . . . vague statements . . . .'" *Trap Rock Indus., Inc. v. local 825, Int'l Union of Operating Eng'rs*, 982 F.2d 884, 890 (3d Cir. 1992) (quoting *Quiroga v. Hasbro, Inc.*, 934 F.2d 497, 500 (3d Cir. 1991)). When considering a motion for summary judgment, the court views the facts and all reasonable inferences drawn from the facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587.

## IV.   DISCUSSION

### A.  FMLA (Count II)

The purposes of the FMLA are to "balance the demands of the workplace with the needs of families and to entitle employees to take reasonable leave for medical reasons." 29 U.S.C. § 2601(b)(1)–(2); *see also Petras v. IAP Worldwide Servs.*, Inc., No. 07-170, 2008 WL 5395750, at *11 (D.N.J. Dec. 23, 2008). To this end, the FMLA was enacted to provide up to twelve weeks of leave for workers whose personal or medical circumstances necessitate that they take time off from work in excess of what their employers are willing or able to provide. *See* 29 U.S.C. § 2612(a)(1)(D); *see also Victorelli v. Shadyside Hops.*, 128 F.3d 184, 186 (3d Cir. 1997). The FMLA defines "employer" as "any person engaged in commerce or in any industry or activity

affecting commerce who employs 50 or more employees for each working day during each of 20 or more calendar workweeks in the current or preceding calendar year." 29 U.S.C.A. § 2611 (West).

Here, before delving into the substance of the FMLA claims, Defendant contends that it is entitled to summary judgment because it is not a covered employer under the FMLA. In support of this contention, Defendant provides an affidavit from Thomas L. Glenn, III, certifying that, in 2018 and 2019, Defendant operated out of two offices in New Jersey – one in Absecon and another in Malaga. Affidavit of Thomas L. Glenn, III, ("Glenn Aff."), ECF No. 46-3, ¶ 2. Defendant did not employ 50 or more employees at any time in 2019. Glenn Aff. ¶ 3. Similarly, in 2018, Defendant did not maintain 50 or more employees on its payroll during 20 or more calendar workweeks. Glenn Aff. ¶ 4. Defendant did not operate any other offices or employ any other individuals within a 75-mile radius of the Absecon and Malaga offices at any time in 2018 or 2019. Glenn Aff. ¶ 5. In response, regarding 2019, Plaintiff points to check register records that he claims establish that Defendant employed more than 50 employees during six bi-weekly pay periods – thus, a total of twelve weeks. Pl.'s RSMF ¶ 3; Pl.'s SSMF ¶ 89. For 2018, Plaintiff similarly points to check register records purporting to show six bi-weekly pay periods wherein Defendant employed more than 50 employees. Pl.'s RSMF ¶ 4; Pl.'s SSMF ¶ 90. Additionally, Plaintiff directs the Court to Defendant's 2018 Quarterly Tax Return ("2018 QTR") reflecting that for the fourth quarter of 2018 – October, November, and December – Defendant stated that 55 employees received wages, tips, and compensation. Pl.'s RSMF ¶ 4; Pl.'s SSMF ¶ 91. Plaintiff also points to Defendant's Employee Handbook specifying that coverage is available for employees under the FMLA. Pl.'s SSMF ¶ 92.

Plaintiff fails to direct the Court to specific evidence raising a genuine issue for trial as to Defendant's status as an employer under the FMLA. First, Plaintiff directs the Court to 2019 check register records spanning twelve weeks wherein Defendant purportedly employed more than 50 employees, however, twelve weeks is not the twenty required by the FMLA. Regarding 2018, again Plaintiff directs the Court to twelve weeks of check register records purportedly establishing that Defendant employed more than 50 employees. Additionally, to reach the required 20-week threshold, Plaintiff directs the Court to Defendant's 2018 QTR. Even accepting that Defendant employed more than 50 employees during the six pay periods identified by Plaintiff in 2018, the 2018 QTR does not establish that Defendant employed 55 employees for each week of the fourth quarter. Pl.'s Ex. 39. The document merely establishes the "[n]umber of employees who received wages, tips, or other compensation" for the fourth quarter. *Id.* The document reflects an aggregate figure and in no way reflects that Defendant employed 55 employees for at least six pay periods in the fourth quarter. Indeed, Defendant references the check register records from the pay periods of September 22, 2018, through December 28, 2018 (the relevant dates for the 2018 QTR's fourth quarter), which show that less than 50 individuals were issued checks for each payroll period.[7] As Plaintiff fails to meet its burden to direct the Court to evidence that Defendant employed more than 50 employees for twenty weeks in 2018 or 2019, Defendant is not a covered employer and Plaintiff's FMLA claim fails.[8] Summary judgment is granted as to Plaintiff's FMLA claim (Count II).

---

[7] Indeed, while in some instances, there were 51 payroll transactions, several individuals were listed twice. Pl.'s Ex. 38. For instance, for the payroll period beginning September 22, 2018, and ending October 5, 2018, there were 51 transactions, however, Denis M. Brown, Michael J. Sheeran, and Joseph B. Malinsky are listed twice. Pl.'s Ex. 38.

[8] Plaintiff states that Defendant's Employee Handbook specifies that coverage is available for employees under the FMLA. First, the cited portion of the Employee Handbook references Defendant's policy on Domestic Violence Leave, not its FMLA policy, and how the intersection of Domestic Violence Leave and FMLA leave is handled. Pl.'s Ex. 38 at D000327. Second, the Court reviewed Plaintiff's brief to gain a better understanding of Plaintiff's argument that Defendant's Employee Handbook somehow confers FMLA eligibility. Pl.'s Opp'n Br. 40. The brief

### B. ADA (Count I) and NJLAD (Count III)

Plaintiff's Complaint alleges that he was subjected to discrimination, retaliation, a hostile work environment, the failure to accommodate, and wrongful termination in violation of the ADA and NJLAD. Defendant contends that Plaintiff cannot establish a *prima facie* case for any of the foregoing claims. The Court will address each argument in turn.[9]

#### 1. Discriminatory Discharge

ADA discriminatory discharge claims are assessed under the framework outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). First, Plaintiff must establish a *prima facie* case by showing that he (1) was disabled; (2) was qualified for his position; and (3) suffered an adverse employment action because of his disability.[10] *Fowler v. AT&T, Inc.*, 19 F.4th 292, 299, fn. 3 (3d Cir. 2021). Notably, the *prima facie* requirement is not onerous and is a burden easily met. *Doe v. C.A.R.S. Prot. Plus, Inc.*, 527 F.3d 358, 365 (3d Cir.), *order clarified*, 543 F.3d 178 (3d Cir. 2008). Thereafter, the burden shifts to the employer to set forth "a legitimate, non-discriminatory reason for its actions." *Id.* Upon providing a legitimate reason, the burden shifts back to Plaintiff to establish that the reason is pretext by providing evidence that would lead a jury to "'(1) disbelieve the employer's articulated legitimate reasons[,] or (2) believe that an

---

contains a conclusory statement that the Employee Handbook allows for requests for leave under the FMLA, this statement is not developed nor is there any statute or case law cited to support this statement. Thus, the Court refuses to credit same.

[9] While the Court's analysis will refer only to the ADA claim, any findings will be equally applicable to the NJLAD claims. As recently noted by the Third Circuit considering ADA and NJLAD claims, New Jersey law generally tracks federal statutes. *Fowler v. AT&T, Inc.*, 19 F.4th 292, 298 (3d Cir. 2021). Nonetheless, the Court will specifically point out any divergence in New Jersey law.

[10] Under the NJLAD to establish a *prima facie* case of disability discrimination, Plaintiff must show that (1) he was disabled or was perceived as having a disability; (2) he "'was performing [his] job at a level that met [his] employer's legitimate expectations'"; (3) he was discharged; and (4) the employer sought another to perform the same work after he was discharged from the position. *Grande v. Saint Clare's Health Sys.*, 230 N.J. 1, 17-18, 164 A.3d 1030, 1039 (2017).

invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.'" *Id.* at 299.

As an initial matter, there is no dispute, for purposes of this MSJ, that Plaintiff suffered from a disability. *See* Def.'s Br. 16 ("Assuming for purposes of this Motion that Plaintiff's bladder cancer diagnosis is a disability within the meaning of the ADA and NJLAD."). It is also undisputed that Plaintiff was terminated on November 21, 2019. However, Defendant disputes that Plaintiff can establish the remaining elements. The Court will consider each of Defendant's arguments point-by-point as to whether Plaintiff proffers sufficient evidence to meet the modest burden of establishing a *prima facie* case.

### i.  Knowledge of Plaintiff's Alleged Disability

Defendant contends that Plaintiff cannot demonstrate that his bladder cancer diagnosis caused him to be unable to work or that anyone knew about it, contending that Plaintiff only disclosed the need to undergo a procedure to remove cysts. Def.'s Br. 16-17. Plaintiff contends that Defendant knew of his disability because Plaintiff testified that it was disclosed to Glenn, Thomas, and Dunn in 2019. Pl.'s Opp'n Br. 10. Moreover, Plaintiff argues that not only was the diagnosis disclosed to Glenn, Glenn sarcastically told Plaintiff to contact a cancer support group. *Id.* 10-11.

Here, Plaintiff points to evidence raising issues of fact concerning whether Glenn knew about his bladder cancer. Plaintiff testified that he told Glenn about the diagnosis during a February 2019 telephone call which included Plaintiff's girlfriend. Moreover, Plaintiff references evidence that, the following day, Glenn expressed frustration about the phone call, telling Plaintiff that he is not his medical concierge and, additionally, that he should go to the Gilda's Club (a

cancer support organization).  Plaintiff points to sufficient evidence, if accepted as true by a jury, to conclude that Defendant knew of Plaintiff's disability.

### ii.   Adequacy of Plaintiff's Performance

Turning to whether Plaintiff was qualified for his position.  Defendant contends that Plaintiff was not adequately performing his job, Def.'s Br. 18-19, a contention Plaintiff disputes. However, at this stage, the Court focuses on whether Plaintiff possessed the minimal qualifications for the position, which Plaintiff demonstrably had, not whether he was performing well.  *Fowler*, 19 F.4th 292, 303; *see also Zive v. Stanley Roberts, Inc.*, 182 N.J. 436, 441, 867 A.2d 1133, 1135–36 (2005) (courts do not consider the quality of Plaintiff's performance at the *prima facie* case step).

### iii.   Whether Plaintiff was Replaced

Next, Defendant argues that Plaintiff was not replaced because his position was eliminated. Def.'s Br. 18-19. Notably, in espousing this argument, Defendant focuses on the NJLAD standard as opposed to the ADA standard and, thus, effectively raises no moving argument about Plaintiff's ability to meet the final element of the ADA standard – whether Plaintiff suffered an adverse employment action because of his disability.  To the contrary, generally, the NJLAD requires Plaintiff to show that the employer sought another to perform the same work after he was discharged from the position. *Grande v. Saint Clare's Health Sys.*, 230 N.J. 1, 17-18, 164 A.3d 1030, 1039 (2017).  Plaintiff argues that Defendant sets forth the wrong standard – this is not accurate.  *See Hejda v. Bell Container Corp.*, 450 N.J. Super. 173, 193, 160 A.3d 741, 752 (App. Div. 2017).  However, what Plaintiff attempts to convey is that New Jersey courts recognize flexibility regarding the fourth factor.  In *Williams v. Pemberton Twp. Pub. Sch.*, 323 N.J. Super. 490, 502, 733 A.2d 571, 578 (App. Div. 1999) (internal citations omitted), the court explained:

> In light of the various contexts in which employment discrimination claims arise, we consider it unwise to require a plaintiff to establish unfailingly as part of the prima facie case that plaintiff was replaced by an individual outside the plaintiff's protected class. The appropriate fourth element of a plaintiff's prima facie case requires a showing that the challenged employment decision (i.e., failure to hire, failure to promote, wrongful discharge) took place under circumstances that give rise to an inference of unlawful discrimination.

See also *Kalim v. Urb. Outfitters, Inc.*, No. A-4811-18, 2021 WL 829727, at *4 (N.J. Super. Ct. App. Div. Mar. 4, 2021) ("Alternatively, to satisfy the fourth element, a plaintiff may show that her discharge 'took place under circumstances that give rise to an inference of unlawful discrimination.'").

Thus, the Court can, and will, apply this flexible approach here. Accordingly, as Defendant's moving argument focuses on the replacement issue, not whether Plaintiff has sustained the burden of establishing an inference of unlawful discrimination, the Court deems this point conceded for purposes of this MSJ. Even if the Court did not find as such, Plaintiff directs the Court to evidence reflecting that after Glenn allegedly learned of Plaintiff's cancer, Glenn reprimanded and belittled him for disclosing the diagnosis. Pl.'s Opp'n Br. 13. Plaintiff points to evidence that Glenn "sarcastically" told Plaintiff he was not a medical concierge and he should call "Gilda's Club" (a cancer support organization). *Id.* Thereafter, Plaintiff states that his knowledge of the EPIC system began to be called into question – indeed, he was removed from the EPIC Committee, he was not permitted to train his staff on EPIC, and his need to work from home due to his medical procedures relating to his medical condition were met with frustration until he was terminated due to the alleged elimination of his position. *Id.* 14-15. Plaintiff references sufficient evidence to meet his modest burden at the *prima facie* stage.

### iv.  Pretext

Defendant states that Plaintiff was terminated after his position was eliminated due to performance failures. Def.'s Br. 19; Def.'s Reply 7. Plaintiff contends that this reason, which Plaintiff argues is one of many shifting reasons, is pretextual. It is Plaintiff's position that he was terminated because of his disability which is evidenced by an ongoing stream of antagonism due to his disclosure of bladder cancer and the need to seek cancer-related treatment. Pl. Opp'n. Br. 13-15. To this end, Plaintiff argues that Glenn reprimanded and belittled him for disclosing his cancer diagnosis and, thereafter, Glenn's attitude toward Plaintiff shifted; his EPIC system knowledge was called into question; he was removed from the EPIC committee; and his requests for time off and to work from home due to medical procedures were met with frustration. *Id.* Defendant contends that Plaintiff cannot establish pretext because no animus was displayed and Plaintiff misrepresents the record to support his argument that there was such animus. Def.'s Reply Br. 7.

At this stage, plaintiff is not required to produce any additional evidence beyond the *prima facie* case. *See Fuentes v. Perskie,* 32 F.3d 759, 764 (3d Cir. 1994). Plaintiff is expected to point to "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons [such] that a reasonable factfinder could rationally find them unworthy of credence," and therefore "infer that the employer did not act for the asserted non-discriminatory reasons." *Id.* at 764–65 (internal quotation marks omitted). Here, while the evidence purportedly supporting pretext is by no means overwhelming, the Court finds that the Plaintiff has proffered just enough evidence demonstrating that there are material issues of fact, which if accepted by a jury, could result in disbelief of Defendant's stated reason for termination or the belief that Plaintiff's disability was a motivating cause. While there is evidence to support Defendant's position that Plaintiff may have experienced performance issues, Plaintiff also

references evidence which discounts or contradicts these alleged performance issues or, at the very least, could lead a jury to find that the issues were manufactured and/or never addressed with Plaintiff.

First, the record evidence prior to Plaintiff's alleged disclosure of his illness to Glenn and Glenn's alleged explosive reaction to same, reflects evidence that a reasonable jury could find was not poor performance at all but merely an adjustment to a new employer. Regarding EPIC, Defendant contends that Plaintiff was experiencing issues with EPIC within the first few months of his employment, however, a reasonable jury could find that Plaintiff was not experiencing "performance issues" but simply learning the system. Indeed, one of the Plaintiff's listed job duties was to learn EPIC. Curiously, by the end of December 2018, Defendant appointed Plaintiff to the EPIC Committee, comprised of only the most proficient users from each department while Plaintiff was still receiving training for the system. Yet now, Defendants seeks to point to Plaintiff's need to gain a greater understanding of the system within the early months of his employment as a performance deficiency. Interestingly, Glenn admitted that the Plaintiff's first few months with Defendant was impressive. A reasonable jury could find inconsistences and implausibility in the Defendant's position.

Second, after Plaintiff's alleged February 2019 cancer disclosure to Glenn (a fact in dispute) and up and until his termination nine (9) months later, the record reflects evidence that could be deemed performance-related issues. Plaintiff, however, directs the Court to evidence which a jury could find does not overwhelmingly demonstrate poor performance and, therefore, perhaps the proffered reason is false. After the alleged disclosure to Glenn, there is evidence that Plaintiff was still attempting to "shore up" his EPIC knowledge, proactively seeking additional training as late as March 2019. In May of 2019, the EMT expressed that Plaintiff needed to gain

the respect of his team and prove his capabilities in sales and underwriting management along with EPIC. These statements were made, however, in the context of the EMT's consideration of Plaintiff as a possible replacement for Thomas' eventual departure. The final piece of objective evidence of potentially subpar performance takes place in July of 2019, when Plaintiff was removed from the EPIC Committee. Conversely, as late as July of 2019, Thomas, who supervised Plaintiff's day-to-day activities, stated that Plaintiff was adding value and wanted to keep him. This statement could be found to bely any performance issues. Notably, after July 2019, the Court has not been directed to any pre-litigation evidence regarding Plaintiff's performance, including formal or informal performance-related discipline, or documents from Defendant outlining a need for Plaintiff to improve in particular aspects of the role. Indeed, in October of 2019, Plaintiff created a self-evaluation of his performance and shared it with Glenn who did not provide any written feedback. The oral feedback is greatly disputed by the parties and it is not the role of this Court to resolve those disputes. Finally, Plaintiff points to evidence that poor performance was not cited as the reason for his termination; position elimination was the reason. Thus, there are existing disputes concerning whether performance was the reason for Plaintiff's termination.

Finally, Plaintiff also references evidence to show that his disability and accommodation of same could have motivated the ultimate decision to terminate his position. First, Plaintiff again points to evidence that Glenn yelled at him for disclosing his cancer diagnosis and began to treat him differently. Plaintiff points to evidence that his requests for time off or work from home accommodations relating to his medical condition were met with frustration by individuals involved in the decision to terminate him, like Wimberg. Finally, Plaintiff was terminated after requesting time to attend two additional medical appointments and/or procedures. Hence, whether

Plaintiff was terminated due to performance or whether the decision was motivated by discrimination raise material issues of fact to be determine by the jury.

### 2.  Failure to Accommodate

Defendant argues that while Plaintiff disclosed the need to undergo a surgical procedure in February 2019 and the need to work at home for a few days after the procedure, Plaintiff never made a request for an accommodation or indicated that he was limited in any aspect of his job performance because of health-related issues. Def.'s Br. 21-22. Notwithstanding this argument, Defendant contends that if the time off or work from home can be considered an accommodation, Defendant permitted Plaintiff to do so whenever he requested it. *Id.* Plaintiff's argument regarding reasonable accommodation is straightforward: he argues that the request for time off or to work from home was an accommodation and he requested time off relating to his medical condition on December 12, 2019, and January 6, 2020 but Defendant effectively denied the accommodation by terminating him before he was able to take the time off. Pl.'s Opp'n Br. 32-33.

"A plaintiff bringing an ADA failure-to-accommodate claim must establish: '(1) he was disabled and his employer knew it; (2) he requested an accommodation or assistance; (3) his employer did not make a good faith effort to assist; and (4) he could have been reasonably accommodated.'"  *Capps v. Mondelez Glob., LLC*, 847 F.3d 144, 157 (3d Cir. 2017) (quoting *Armstrong v. Burdette Tomlin Mem'l Hosp.*, 438 F.3d 240, 246 (3d Cir. 2006)).[11]

---

[11] In *Capps,* the Third Circuit noted that although it quoted *Armstrong* which involved a claim under the NJLAD, NJLAD failure to accommodate claims have been interpreted similar to those arising under the ADA. Likewise, New Jersey courts have noted that although the required elements for a failure to accommodate claim are not identical to those considered under the ADA, the same proofs are implicated. *Royster v. New Jersey State Police,* 227 N.J. 482, 500, 152 A.3d 900, 910 (2017). A failure-to-accommodate claim under the LAD requires plaintiff to demonstrate: (1) plaintiff is an individual with a disability; (2) plaintiff is qualified to perform the essential functions of the job, with or without reasonable accommodations; and (3) that defendant failed to reasonably accommodate plaintiff's disabilities. *Id.*

Here, the Court finds that Plaintiff references sufficient evidence for a jury to conclude that he requested an accommodation and Defendant failed to interact with Plaintiff or provide the accommodation.   First, as to Defendant's contention that Plaintiff never requested an accommodation, Def.'s Br. 21, while there are issues of fact about whether Plaintiff disclosed his bladder cancer diagnosis, the parties seem to agree that Plaintiff disclosed a medical ailment which would require on-going medical treatment and the need for time off or to work from home.  Pl.'s SSMF ¶ 63.  Viewing the facts most favorable to Plaintiff, there is sufficient record evidence for a jury to conclude that the accommodation requested by Plaintiff was the need for time off or to work from home following various procedures and surgeries in connection with his medical issues. Pl.'s SSMF ¶ 63, 65-67.  Plaintiff referenced doctor's notes excusing his absences or clearing his remote work to support the requested accommodations and belying the argument that his requests to work from home or for time off were unrelated to a medical reason.  Notably, in a September 23, 2019 email to Wimberg, Plaintiff specifically stated the need for a work-from-home "accommodation" in connection with a upcoming surgery.  Pl.'s Ex. 43.  Time off or leaves of absences relating to a disability can be an accommodation.  *McFadden v. Biomedical Sys. Corp.*, No. CIV.A. 13-4487, 2014 WL 80717, at *5 (E.D. Pa. Jan. 9, 2014) (noting that a medical leave to undergo surgery is a reasonable accommodation).  Likewise, it is well-established that a plaintiff need not use the exact word "accommodation" to request same, although here, on one occasion, Plaintiff did.  *Tynan v. Vicinage 13 of Superior Ct.*, 351 N.J. Super. 385, 400, 798 A.2d 648, 656 (App. Div. 2002) (accommodation request need not be in writing or use the term "reasonable accommodation," it must simply be clear that the person is requesting assistance with a disability). Here, disputes exist concerning whether Plaintiff requested accommodations (via either time off

or remote work) relating to his cancer diagnosis and ongoing medical procedures necessitated by same.

Second, as to whether Defendant failed to make an accommodation, Plaintiff points to evidence that he requested time off on December 12, 2019 and January 6, 2020 to obtain medical treatment, Defendant purportedly granted it, and then Defendant terminated him prior to Plaintiff's ability to utilize the requested accommodation. Pl.'s SSMF ¶¶ 71-72. Plaintiff also points to evidence that, which if believed by a jury, demonstrates Wimberg's frustration with Plaintiff's continued remote work. Indeed, Wimberg cut Plaintiff off when he tried to explain his condition and the need for the time off or the ability to work from home. The Court, providing all reasonable inferences to Plaintiff, notes that a reasonable jury could conclude that Defendant terminated Plaintiff's employment to avoid accommodating his ongoing need for medical treatment relating to his bladder cancer. Summary judgment is denied as to the reasonable accommodation claim.

### 3. Retaliation

To establish a *prima facie* case of retaliation under the ADA, plaintiff must show: "'(1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action.'" [12] *Stouch v. Twp. Of Irvington*, 354 Fed. App'x 660, 667 (3d Cir. 2009) (quoting *Williams v. Phila. Hous. Auth. Police Dept.,* 380 F.3d 751, 759 (3d Cir.2004)). Defendant, challenging the first and third elements, argues that Plaintiff's claims for retaliation fail because there is no evidence that Plaintiff engaged in a protected activity (a request for an accommodation) or of a retaliatory motive or pretext. Def.'s Br. 22. As an initial

---

[12] The same test is used to evaluate a claim of retaliation under the NJLAD. *Stouch*, 354 Fed. App'x 660, 667, fn. 5 (citing *Tartaglia v. UBS PaineWebber Inc.,* 197 N.J. 81, 961 A.2d 1167, 1192 (2008)).

matter, regarding Defendant's argument as to the first element – namely, that Plaintiff never requested an accommodation and never reported an inability to work due to health issues, the Court quickly resolves this issue. The Court determined above, as related to the failure-to-accommodate claim, that Plaintiff met his burden of referencing evidence that he requested an accommodation.

Turning to Defendant's next argument, Plaintiff points to evidence of an alleged continuous stream of antagonism which the Court addressed in Section B.1.iv., *supra*. Plaintiff also references Glenn's alleged explosive reaction to the alleged disclosure of the cancer diagnosis. Pl.'s SSMF ¶ 54-55. Moreover, Plaintiff points to Wimberg's statements as further evidence of Defendant's frustration with his request for time off and telework due to his medical issues. Indeed, in July 2019, after emailing with Plaintiff about his need to work from home and request to remove charged personal time off, Wimberg sent the following email to Thomas separately:

█████████████████████████████████████████████████

Pl.'s SSMF ¶ 64.    Defendants dispute this evidence and Plaintiff's characterization of same, however, it is not the role of the Court to resolve these factual issues. Construing this evidence in a light most favorable to Plaintiff, a reasonable jury could conclude that Glenn reacted unfavorably to Plaintiff's diagnosis and Wimberg was frustrated by Plaintiff's repeated requests for accommodation by questioning if Plaintiff was still having medical issues or whether and what he was doing from home. Indeed again, Wimberg would not even listen to Plaintiff about his need to work from home. Plaintiff continued to request either time off or remote work to attend medical appointments or to have surgeries on select dates from August through November of 2019. Pl.'s Ex. 35, 42, 43.    Plaintiff references evidence that Glenn and Wimberg were involved in the November 2019 decision to terminate Plaintiff. Pl.'s Ex. 31. The Court finds that there are factual

disputes concerning the causal relationship between the protected activity and Plaintiff's termination. Summary judgment is denied.

### 4. Hostile Work Environment

To establish a cause of action for hostile work environment under the ADA, Plaintiff must show (1) he was a qualified individual with a disability under the ADA; (2) he was subject to unwelcome harassment; (3) the harassment was based on the disability or a request for an accommodation; (4) the harassment was sufficiently severe or pervasive to alter the conditions of employment and to create an abusive working environment; and (5) the employer knew or should have known of the harassment and failed to take prompt effective remedial action.[13] *Walton v. Mental Health Ass'n. of Se. Pennsylvania*, 168 F.3d 661, 667 (3d Cir. 1999).

The main dispute here is whether Plaintiff was subjected to harassment that was severe or pervasive enough to alter the conditions of employment **and** to create an abusive working environment. Defendant contends that anti-discrimination laws are not intended to function as civility codes and no reasonable person could consider Plaintiff's performance issues and subsequent removal from the EPIC committee based on the failure to learn the system to be severe or pervasive. Def.'s Br. 24. Plaintiff points to the following evidence which he contends, considered in the aggregate, demonstrates he endured harassment that meets the aforementioned standard:

- Glenn's February 2019 "explosive" reaction to the news of Plaintiff's cancer where he sarcastically told Plaintiff that he is not a medical concierge and to call Gilda's

---

[13] Similarly, "to establish a cause of action for a hostile work environment under the NJLAD, a plaintiff must demonstrate 'that the complained-of conduct (1) would not have occurred but for the employee's protected status, and was (2) severe or pervasive enough to make a (3) reasonable person believe that (4) the conditions of employment have been altered and that the working environment is hostile or abusive.'" *Stouch*, 354 Fed. App'x 660, 667 (quoting *Shepherd v. Hunterdon Developmental Ctr.*, 174 N.J. 1, 803 A.2d 611, 625 (2002)).

Club.   Plaintiff suggests this incident alone altered the conditions of his employment.  Pl.'s Opp'n Br. 35;

- Being excluded from group lunches that he previously participated in. Pl.'s Opp'n Br. 36;

- Removal from the EPIC Committee. *Id.*;

- Prohibited from training his own staff on the EPIC system. *Id.*;

- Denial of assistance relating to the completion of projects assigned to him. *Id.*;

- Being interrupted by Wimberg when he attempted to explain the alleged life-threatening nature of his illness.  *Id.*

Here, Plaintiff fails to sustain his burden to point to evidence establishing harassment that was "severe or pervasive" so as to create an abusive work environment.  To ascertain whether a work environment was hostile or abusive, courts consider "'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Walton*, 168 F.3d at 667.  Notably,

> [S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment. Instead, a hostile work environment requires conduct that is "severe or pervasive enough to create an objectively hostile or abusive work environment— an environment that a reasonable person would find hostile or abusive[.]

*Wright v. Providence Care Ctr., LLC*, 822 Fed. App'x 85, 96 (3d Cir. 2020) (internal quotations and citations omitted).  The Court, in viewing the evidence most favorable to Plaintiff, finds that the February 2019 Glenn incident may have been humiliating or offensive, however, it is well-established that a single, isolated incident, unless extremely serious, fails to sustain a hostile work environment claim.  *Id.*

Moreover, considering the February 2019 Glenn incident in conjunction with the other evidence referenced by Plaintiff also misses the mark. First, the failure of Glenn to invite Plaintiff for lunch either individually or in a group or Wimberg cutting him off as he tried to explain his condition in support of his time off or remote work can be characterized as nothing more than "cold" or "uncivil" at best. *Shepherd*, 174 N.J. at 25 ("A supervisor's coldness, lack of civility, or failure to provide employees with Christmas gifts or party invitations, although inhospitable and boorish, cannot qualify as "severe or pervasive" conduct under the LAD"). The remaining evidence appears to be presented to show harassment that unreasonably interfered with Plaintiff's work performance and/or conditions. However, while Plaintiff points the Court to evidence of the EPIC training issue, Plaintiff's removal from the EPIC Committee, and Plaintiff's identification of a single incident of Glenn's alleged failure to provide him log-in information to enable him to complete a revenue report, Plaintiff fails to direct the court to record evidence demonstrating how these occurrences unreasonably interfered with his work performance or altered the conditions of employment. These incidents also fail to rise to the level of severe or pervasive conduct as there is no referenced evidence demonstrating an objectively hostile or abusive work environment.

Indeed, Plaintiff's evidence is distinguishable from the *Briggs* case cited by Plaintiff. In *Briggs*, plaintiff was subjected to **daily** bullying and harassment by her supervisor. *Briggs v. Temple Univ.*, 339 F. Supp. 3d 466, 503-504 (E.D. Pa. 2018). The supervisor would raise his voice and yell degrading things at plaintiff in public, like telling plaintiff she should be put out to pasture. *Id.* Moreover, despite plaintiff's complaints to various individuals, same went unremedied. *Id.* The evidence presented here is significantly different.

Instead, the facts presented here are more similar to the unpublished Third Circuit decision in *Wright*, affirming a district court's grant of summary judgment. In *Wright*, plaintiff contended

that after requesting medical accommodations her supervisor began to treat her poorly by subjecting her to unwarranted discipline and an unfair negative performance review, transferring her from her usual floor assignment to a less desirable unit, pulling her usual floor to other units, being rude and condescending to her, and ignoring her, *inter alia*. *Wright, LLC*, 822 Fed. App'x at 88. While the Third Circuit noted that plaintiff pointed to sixteen different occurrences, taken individually or in the aggregate, the occurrences were not severe enough "to alter the conditions of her employment and to create an abusive working environment." *Id*. at 97. The Third Circuit further stated that there was no evidence demonstrating that "anything done or said to her unreasonably interfered with her work performance" as plaintiff maintained that she performed her job at the level expected of her. *Id*. Moreover, the Third Circuit explained:

> Occurrences such as being ignored, told once to "shut up," hearing an offhand comment about collecting disability, being temporarily pulled to work on another floor at the facility, receiving a marginally negative performance review without cause, and scheduling annoyances, while no doubt unpleasant, are not objectively "extreme," as is required for a viable ADA hostile workplace claim.

*Id*. Plaintiff also points to only a handful of incidents occurring over many months. The February 2019 Glenn incident, lack of invitations to lunch, and evidence that Wimberg ignored him are similar to those occurrences the Third Circuit found to be unpleasant but not objectively extreme. Likewise, Plaintiff points to evidence that he was removed from the EPIC Committee and unable to train his staff on the EPIC system which is akin to the *Wright* plaintiff receiving unwarranted discipline and being transferred and pulled from normal assignments. Just like the plaintiff in *Wright*, months later, Plaintiff drafted a performance evaluation for himself which indicated that he was performing at a level expected, thus, there is no evidence of how these occurrences impacted his work performance, altered the conditions of employment, or created an abusive environment. Defendant is entitled to summary judgment on the hostile work environment claims.

### C. Punitive Damages

Defendant asks this Court to strike Plaintiff's request for punitive damages as said damages are limited to particularly egregious behavior and there is no evidence of such conduct here. Def.'s Br. 28. Plaintiff argues that the matter of punitive damages is generally an issue of fact. "[T]he issue of punitive damages is generally a question of fact for the jury." *Zulauf v. Stockton Univ.*, No. CV 15-3526, 2017 WL 700111, at *11 (D.N.J. Feb. 22, 2017). At this juncture, the Court, having determined that there exist material issues of fact surrounding Plaintiff's claims, will follow the *Zulauf* court's approach and deny without prejudice Defendant's request, reserving this issue to be raised at trial.

### V.    CONCLUSION

For the reasons set forth above, Defendant's Motion for Summary Judgement is granted in part and denied in part. Summary judgment is granted as to Plaintiff's FMLA claims (Count II) and the hostile work environment under the ADA and NJLAD (Counts I and III). Summary judgment on the remaining claims is denied. An appropriate order will issue.

Dated: March 31, 2023

KAREN M. WILLIAMS
United States District Judge